UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

TERRY RUTLEDGE *et al.*,

            Plaintiffs,

        v.                                          CAUSE NO. 3:22-CV-989 DRL

INDIANA DEPARTMENT OF
CORRECTIONS *et al.*,

            Defendants.

<u>OPINION AND ORDER</u>

Officers conducted a shakedown at Indiana State Prison in Michigan City (ISP) from April 27-30, 2021. Terry Rutledge,[1] Marshaun Buggs, Cody Phelps, and Thomas Manjarez were all housed at ISP during this time. They allege that, during the shakedown and for days after, they were subjected to inhumane conditions that violated the Eighth Amendment and that Lieutenant Dujuan Lott and Sergeants Erica Hilliker, Brandon Stovall, and Antonio Allmon were deliberately indifferent to these conditions. Additionally, Cody Phelps and Terry Rutledge allege that firefighters Jimmie Vincent, Wyatt Dunkley, and Cameron Stuart used excessive force by spraying them with a firehose in violation of the Eighth Amendment. The defendants moved for summary judgment on all claims by all plaintiffs. The court addresses each motion today.

BACKGROUND

In April 2021, the plaintiffs resided at ISP. Cody Phelps and Terry Rutledge were housed in cells on the 100-level range of D Cellhouse [122-2 ¶ 2; 122-4 ¶ 3]. Thomas Manjarez and

---

[1] Terry Rutledge uses "miss/ma'am" and now identifies as a woman [112-8 Tr. 4-5]. The court acknowledges this new preference, but this order still uses "Mr." and "he/his/him" pronouns to remain consistent with the record, as it exists, to avoid confusion.

Marshaun Buggs were on the 300-level range [122-14 ¶ 2; 122-11 Tr. 7]. In D Cellhouse, each inmate is in an individual cell [122-10 Tr. 14].

From April 27-30, 2021, ISP conducted a shakedown [106-13], following the murders of an inmate and a lieutenant [122-8 Tr. 15]. Shakedowns require moving inmates to different cells before searching for weapons or other threatening contraband [122-10 Tr. 15-16]. All inmates are subject to shakedown conditions [*id.* Tr. 16]. The IDOC Emergency Response Operations, SERT Team (Special Emergency Response Team), and Emergency Control Units (E-Squads) assisted with this shakedown [106-1 ¶ 6]. Everyone in D Cellhouse moved [122-10 Tr. 32]. During the shakedown, emergency teams replaced the normal prison staff, who were sent away so they wouldn't interfere [122-9 Tr. 19-20; 122-16 Tr. 12]. Lieutenant Lott and Sergeants Hilliker and Stovall, along with the regular staff, were not on the range for at least the four days of the shakedown. Mr. Rutledge doesn't remember seeing them in D Cellhouse during the shutdown [122-3 Tr. 55]. As part of the E-Squad, Sergeant Allmon was present for some of the shakedown. During the shakedown, no movement was permitted, even for showers [122-10 Tr. 19].

Early in the morning on the shakedown's fourth day, inmates started a fire on the range, near Mr. Rutledge's and Mr. Phelps' cells [104-13 at 6]. They also "trashed the range" because they "didn't want to make it easy" for the officers [122-3 Tr. 22]. Staff firefighters, including Jimmie Vincent, Wyatt Dunkley, and Cameron Stuart, were deployed to extinguish the fire [106-13 at 6]. Firefighter Dunkley explained that the fire was "large enough to use the firehose" [104-11 Tr. 30]. Mr. Rutledge testified it was a "couple small fires" [122-3 Tr. 22]. Firefighter Dunkley, along with Firefighter Vincent and Firefighter Stuart, held the hose, and Firefighter Stuart sprayed

it [106-11 Tr. 32-33]. The water hose sprayed Mr. Rutledge and Mr. Phelps [*id.* Tr. 27-28]. From there, stories diverge.

Mr. Rutledge and Mr. Phelps allege that the firefighters intentionally sprayed them with the hose with enough force ("full blast") to hurt them from about two feet away [122-3 Tr. 58-59]. Mr. Phelps testified that after all the fires on the range had been put out, the firefighters came to his cell and started hosing him down [122-1 Tr. 21-22]. He says he yelled for the firefighters to stop because he couldn't breathe, but they continued for four to five minutes and shot his legs with the hose, knocking his feet from under him [*id.* Tr. 22, 27].

Mr. Rutledge says hearing Mr. Phelps scared him, and he began to scream, but then the firefighters sprayed him through a metal fence [122-3 Tr. 59-60]. He testified that it went on for around three minutes, and the water hit him in the face, throwing him into a metal cabinet [*id.* Tr. 57]. The firefighters deny this and claim they were just trying to put out fires. When the firefighters left, Mr. Rutledge says he had four or five inches of water in his cell, and the range had flooded [*id.* Tr. 63].

Mr. Manjarez, Mr. Buggs, Mr. Rutledge, and Mr. Phelps also say that the conditions of the cells that they moved to during the shakedown were inhumane. They allege that ISP denied them cleaning supplies and clothes and took their belongings before leaving them in cells with fecal matter and blood on the walls from around April 27, 2021 to around May 5, 2021. The cells were cold, rodent-infested, and without running water for multiple hours a day [122-4 ¶ 24; 122-2 ¶ 26-27]. Mr. Phelps testified that he was never given any additional clothing and had to crawl inside a mattress to avoid freezing [122-1 Tr. 37]. They also claim they weren't allowed to shower for nine days, including five after the shakedown ended [1 ¶ 30]. Mr. Manjarez adds that his hernia

belt was taken [122-14 ¶ 25-26]. Mr. Rutledge notes that he spent a week and a half without access to water, a sink, soap, or cleaning supplies and had to sleep on a thin pad soiled with urine [122-4 ¶ 24, 26]. They claim that they complained to the officers, but nothing was done [*see, e.g.*, 122-15 at 1, 5]. The officers deny knowing the plaintiffs complained [112-17 ¶ 22-23 (Sergeant Hilliker); 106-16 ¶ 19-22 (Sergeant Stovall)]. Lieutenant Lott denies interfering with or preventing any showers [112-18 ¶ 18]. Mr. Phelps and Mr. Manjarez say they received showers on May 5, 2021, five days after the shakedown [122-1 Tr. 41; 122-13 Tr. 31]. Mr. Rutledge received his first shower around May 6 or 7, 2021 and cleaning supplies on May 8, 2021 [93 Tr. 16-17, 27; 122-4 ¶ 25].

Mr. Rutledge raises additional complaints. After these events in April, Lieutenant Lott moved him to a special management cell (SMC) on May 11, 2021 for throwing water on food trays that hit a correctional officer [122-3 Tr. 24-25]. He says the conditions were similarly bad there, and he complained to Sergeant Allmon about them [*id.* Tr. 39], but again no one helped him. The defendants filed summary judgment motions against each plaintiff.

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp./Nichols-Homeshield*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the

facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll. v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

"Although on summary judgment [the court] generally view[s] the facts in the light most favorable to the nonmovant, in rare circumstances when video footage clearly contradicts the nonmovant's claims, [the court] may consider that video footage without favoring the nonmovant." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378-81 (2007)). "Of course, videos are sometimes unclear, incomplete, and fairly open to varying interpretations," but "[w]hen video footage firmly settles a factual issue, there is no genuine dispute about it, and [the court] will not indulge stories clearly contradicted by the footage." *Id.*; *see also Dockery v. Blackburn*, 911 F.3d 458, 466-468 (7th Cir. 2018) (plaintiff's claim that he didn't resist was "utterly discredited" by the video that clearly depicted resistance); *Gasser v. Vill. of Pleasant Prairie*, 2022 U.S. App. LEXIS 8015, 4-5 (7th Cir. Mar. 28, 2022) ("[T]o the extent [plaintiff's] story is blatantly contradicted by the video such that no reasonable jury could believe it, we do not credit [plaintiff's] version of events.") (quotations and citation omitted).

DISCUSSION

The plaintiffs claim violations of their constitutional rights under 42 U.S.C. § 1983. Section 1983 serves as a procedural vehicle for lawsuits "vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To establish a § 1983 claim, each plaintiff must show that he was "deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). He may bring a § 1983 claim only against an individual "personally responsible for the constitutional deprivation." *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002). The plaintiffs here advance two theories under the Eighth Amendment: deliberate indifferent to alleged inhuman conditions and excessive force.

A.    *Procedural Issues.*

Before getting to these substantive claims, the plaintiffs raise procedural issues. They ask the court to deny the summary judgment motions as untimely. They also note that the defendants failed to meet and confer in accordance with the court's rules on summary judgment and point out that the defendants didn't file a separate index identifying each of the attached exhibits. The plaintiffs also fault the defendants for filing four individual motions for summary judgment and statements of material fact.

In response, the defendants apologize to the court for filing late—citing technology issues and noting that they filed the motions by 12:51 a.m. on June 4, 2024, 51 minutes after the court's deadline. Of course, technological issues can be avoided if parties don't wait until the final minutes to file, but a 51-minute delay didn't prejudice the plaintiffs, and the court won't strike the motions on this basis.

The defendants next say that they did attach exhibit indexes, and they blame the plaintiffs for the multiple motions because the plaintiffs chose to file a lawsuit with four remaining plaintiffs, seven remaining defendants, and two different theories and have resisted attempts to bifurcate the case. The plaintiffs chose to bring the case, the parties have complied with the court's request to streamline briefing, and nothing more needs to be said about that issue. More talk is less on this front.

Finally, the defendants fault the plaintiffs for referring to the court's website directions on meeting and conferring. The defendants quibble with the plaintiffs' reliance on the court's guidance regarding summary judgment procedure. The court isn't accustomed to its directions being disregarded wherever they might appear or be said, particularly when designed in this day and age to be readily available on the court's website to the masses. The instruction is clear: "parties must meet and confer in good faith before filing any summary judgment motion to streamline the issues, to address choice of law, and to plan the efficient presentation of arguments. The movant must certify in the motion that the parties have so conferred, else the court may take remedial action."

The defendants claim that this isn't contained in any order from the court, and they declare the court's meet and confer requirement to be both impractical and not beneficial for their case. Then they should have filed a motion to be released of this obligation. A "must" isn't an option. The mere fact that the court now must spend time addressing these procedural issues is a telltale sign that compliance would have saved everyone time (and clients money) had lawyers just done their job. Parties should heed instructions from the court, whether on the website, in the local rules, or in court orders—they are not optional based on parties' assessments of their worth.

Just as an example, contrary to the defendants' statements, a meeting between the two sides here would have helped establish—and thus saved both the parties and the court time—that only Mr. Phelps and Mr. Rutledge had claims against the firefighter defendants, as Mr. Buggs and Mr. Manjarez abandoned their claims. Because the parties have fully-briefed the motion, the court will not take remedial action this time, but the defendants should note and be forewarned that failure to comply with the court's requirements in the future may result in sanctions or stricken motions.

    B.    *Conditions of Confinement against Prison Guard Defendants.*

The plaintiffs allege that Lieutenant Dujuan Lott, Sergeant Erica Hilliker, Sergeant Brandon Stovall, and Sergeant Antonio Allmon were deliberately indifferent to inhumane living conditions. Under the Eighth Amendment, prisoners cannot be subjected to cruel and unusual punishment. *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). The Constitution doesn't mandate "comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), and inmates cannot expect the "amenities, conveniences and services of a good hotel," *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988). Prison conditions may be "harsh and uncomfortable" without violating the Constitution. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012), *abrogated on other grounds as recognized by Kemp v. Fulton Cnty.*, 27 F.4th 491, 495-96 (7th Cir. 2022). But conditions must still be humane. *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021). Inmates must be provided with adequate food, clothing, shelter, bedding, hygiene materials, and sanitation. *See Townsend v. Cooper*, 759 F.3d 678, 687 (7th Cir. 2014); *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). The Eighth Amendment prohibits

conditions of confinement that deny inmates "the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citations omitted).

In evaluating an Eighth Amendment conditions of confinement claim, the court conducts both an objective and subjective inquiry. *Farmer*, 511 U.S. at 834. The objective prong asks whether the alleged deprivation is "sufficiently serious" such that a prison official's act results in the denial of "the minimal civilized measure of life's necessities." *Id.* (citations omitted). The subjective prong asks whether the defendant acted with "deliberate indifference" to the inmate's health or safety. *Id.*; *see also Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (defining deliberate indifference). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board*, 394 F.3d at 478 (citations and quotations omitted); *see also Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999) (where inmate complained about severe deprivations but was ignored, he established a "prototypical case of deliberate indifference."). "[S]howing mere negligence is not enough." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*). A prisoner who demonstrates "deplorably unsanitary conditions" may still fail to prove his claim if he cannot show "prison officials responded with deliberate indifference to the abysmal cell conditions." *Thomas*, 2 F.4th at 720.

Duration is one key factor to consider. A short-term problem may not violate the Constitution while long-term exposure to unsanitary conditions may. *See Gray v. Hardy*, 826 F.3d 1000, 1007-08 (7th Cir. 2016); *White v. Monohan*, 326 F. Appx. 385, 388 (7th Cir. 2009) ("close case" whether five-year exposure to roaches, mice, bees, and wasps that stung plaintiff and caused

scars stated a claim of unconstitutional conditions of confinement). Over an adequate duration, "harm from living in a small cell infested with mice and cockroaches is pretty obvious." *Thomas*, 697 F.3d at 615; *accord Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) ("prolonged pest infestation, specifically a significant infestation of cockroaches and mice," may be considered a deprivation sufficient to constitute a constitutional violation); *Davis v. Williams*, 216 F. Supp. 3d 900, 907-08 (N.D. Ill. 2016) (same).

Plaintiffs seeking to establish liability under § 1983 must also establish individual liability for the violations alleged. *See Burks v. Raemisch*, 555 F.3d 592, 593 (7th Cir. 2009) (no vicarious liability); *see also Boyd v. Davis*, 2000 U.S. App. LEXIS 18777, 7 (7th Cir. Aug. 1, 2000) (applying this personal involvement requirement to cell conditions claim); *Lucien v. Bierman*, 1995 U.S. App. LEXIS 7913, 2 (7th Cir. Apr. 6, 1995) (same). Plaintiffs may establish deliberate indifference using "inference from circumstantial evidence, including evidence that the risk was so obvious that a jury may reasonably infer actual knowledge on the part of the defendants." *Vinning-El v. Long*, 482 F.3d 923, 924-25 (7th Cir. 2007) (quotations and citations omitted).

The prison defendants argue that the plaintiffs have not established that the defendants were personally involved in these cell conditions—they note that only Sergeant Allmon, and him only very briefly—was in D cellhouse at the time of the alleged offense. Lieutenant Lott swore that he was never on the D cellhouse range during the shakedown; no regular staff was [106-1 ¶ 7-8]. Sergeant Hilliker testified that she was never present during any shakedown and didn't remember any of the plaintiffs [106-4 Tr. 22-23]. Sergeant Stovall was present at the prison, but his staff "wasn't allowed to be in the areas they were shaking down" because special force teams completed the shakedown [106-5 Tr. 12]. No plaintiffs dispute that outside units conducted the

shakedown [124 ¶ 14; 125 ¶ 14; 126 ¶ 14; 127 ¶ 20]. Sergeant Allmon, who was part of the E-Squad, never went onto the range; he testified that his "job was just to stand in front of the range to make sure everything was okay" [122-8 Tr. 12].[2]

The plaintiffs cite *Vinning-El* for the proposition that circumstantial evidence can allow a reasonable jury to infer knowledge of an incarcerated person's conditions. *Vinning-El*, 482 F.3d at 924-25. In *Vinning-El*, though, the court specifically noted that the defendants were alleged to have been responsible for the unit conditions and never "denied being involved in [the plaintiff's] detention there," instead arguing only that they were unaware of specific conditions. *Id.* at 924. These defendants, with the exception of Sergeant Allmon, argue that the shakedown prevented them from being on the cell range. That distinguishes this case and makes the inferential leap the plaintiffs want to rely on unreasonable for a factfinder, at least from April 27-30, 2021.

During the shakedown period, no reasonable jury could find that the officers knew about the conditions. Sergeant Hilliker testified that she worked in D Cellhouse and walked "the ranges to see if anybody need[ed] anything," so the plaintiffs argue that she should have known about the conditions [122-9 Tr. 17]. But Sergeant Hilliker also testified that once the E-squad was activated, she "was kicked out of [her] cellhouse . . . [t]he entire time they were doing the shakedowns no regular staff [wa]s to be involved in E-Squad business once they [we]re activated" [*id.* Tr. 19-20]. Sergeant Hilliker described how she went to a neighboring cellhouse because she was not supposed to interfere and was never present during any shakedown [*id.* Tr. 20, 23].

---

[2] He does seem to say that he helped move inmates [122-8 Tr. 14 ("my job was to move them from Point A to Point B and get out the way")].

Similarly, the plaintiffs argue that Sergeant Stovall testified that his duties included monitoring his staff and incarcerated individuals, but they ignore his testimony that he "wasn't allowed to be in the areas they were shaking down" because teams from other places were doing it [122-16 Tr. 12]. If he wasn't even allowed to be in the area, no reasonable jury could infer that he had knowledge of the cell conditions during the April shakedown—not on this record.

The plaintiffs also argue that Lieutenant Lott was assigned to D Cellhouse and was in charge, but he explained that during the shakedown, he wasn't in charge [122-10 Tr. 30 ("I have no idea exactly who was in charge of that shakedown."). He was "basically in limbo" and went to do other things because "at the moment, it's not [his] cellhouse" [*id.* Tr. 33].

Sergeant Allmon is the only named prison guard who actually played a role in the shakedown, as a member of the E-Squad [122-8 Tr. 46]. He helped moved the inmates from their original cells to their new locations [*id.*]. He testified that the inmates "were giv[en] a little bag with toothpaste, a toothbrush, and a bar of soap" that officers passed out each shakedown day [*id.* Tr. 16]. Even Mr. Rutledge conceded the shakedown was a "down-state decision" [112-8 Tr. 27].

This case doesn't end with the shakedown. The problem for the officers is that the allegations about conditions extend beyond the four-day shakedown. They say the court must grant summary judgment because they didn't have any personal involvement in the April 2021 shakedown. But their argument doesn't warrant summary judgment on the claims for unconstitutional confinement conditions extending beyond the four shakedown days. The prison defendants say they weren't meaningfully involved in the shakedown or in deciding what cells the plaintiffs went to during the shakedown, but if they were aware of the conditions at the beginning

of May, as the plaintiffs claim they were, then their arguments about the shakedown don't matter. The plaintiffs allege that they couldn't shower for nine days, and that nine days included five days beyond the shakedown time—May 1-5, 2021. The prison defendants weren't present for the shakedown, but there is a question of fact about whether they were present for the next five days that the plaintiffs reported being left in the cold, living in filthy cells in only their boxer shorts, without hygiene supplies.

The question becomes whether a reasonable jury could conclude that any prison officer actually knew of the substantial risk of serious harm to the inmates due to the conditions and still disregarded it in the days following the shakedown. *Pierson v. Hartley,* 391 F.3d 898, 902 (7th Cir. 2004). Mr. Phelps and Mr. Rutledge assert that the claims about the unsanitary conditions "largely stem from the fallout from the incidents leading up to and following the Firefighter Defendants' use of the firehose." This happened on the shakedown's final day, and the named prison guard defendants weren't in the prison then. The plaintiffs' response to summary judgment largely focuses on the conditions. They recount the mice, cockroaches, filth, cold temperatures, lack of showers, and lack of adequate clothing. Even acknowledging that these conditions may have violated the Eighth Amendment, the plaintiffs must show that these prison officers knew of these conditions and "consciously disregarded an excessive risk to [the prisoners'] health and safety." *Daugherty v. Harrington*, 906 F.3d 606, 611 (7th Cir. 2018).

The plaintiffs generally allege that because Lieutenant Lott was in charge of D Cellhouse, a reasonable jury could infer that he could have known about the conditions. *See Vinning-El*, 482 F.3d at 925 ("a reasonable jury could infer that prison guards working in the vicinity necessarily would have known about the condition of the segregation cells."). Similarly, they note that

Sergeants Hilliker and Stovall regularly worked on the range [122-9 Tr. 17; 122-16 Tr. 9]. Beyond that, they point to evidence that the prison officials knew. They testify that they complained about the conditions to the officers. Mr. Phelps reported complaining about the lack of hygiene, infestations, and need for cleaning supplies to Lieutenant Lott and Sergeants Stovall and Hilliker [122-2 ¶ 34-35]. Mr. Rutledge says he complained to Lieutenant Lott and Sergeants Stovall and Hilliker [122-4 ¶ 29].

Mr. Phelps says that he was left in nothing but a single pair of underwear for days in a cell with mice, cockroaches, mouse feces, and mold [122-2 ¶ 25-26; 122-1 Tr. 41]. He says that the cell was so cold he had to crawl in his mattress at night to stay warm [122-2 ¶ 31]. These cell conditions lasted from when he says he was sprayed with the firehose at the end of the shakedown until he received clothes and a shower on May 5 [122-1 Tr. 41]. He wasn't permitted to shower from April 25, 2021 (before the shakedown) until May 5, 2021 [122-2 ¶ 33]. He complained about the conditions, including the hygiene, infestations, and lack of bedding to Lieutenant Lott and Sergeants Stovall and Hilliker [*id.* ¶ 34-35].

Mr. Buggs says on April 30, 2021, he was moved to a cell with blood and fecal matter on the walls and left with only his t-shirt, underwear, and shower shoes for ten days [122-12 ¶ 12-13, 25]. He also complains that the temperatures dropped into the 30s and 40s at night [*id.* ¶ 24]. He lacked toilet paper, couldn't wash his hands, and wasn't provided utensils [*id.* ¶ 19-21]. He says he was denied a shower for nine days [*id.* ¶ 23]. He filed grievances that said he complained to Sergeants Stovall and Hilliker and Lieutenant Lott [122-15]. He also testified that people were complaining to Sergeant Hilliker about the conditions and that he asked for cleaning supplies around May 3, 2021, and she told him she would talk to Lieutenant Lott and said she would see

14

"what we can do" about the cleaning supplies [122-11 Tr. 27, 45-46]. He doesn't remember receiving them [*id.* Tr. 46].

Mr. Rutledge's complaints about conditions center around two periods—roughly eight days from the shakedown's end to May 8, 2021 [122-4 ¶ 25-27], and May 11 to May 20, 2021, when he was housed in solitary confinement [122-3 Tr. 24-25]. He claims that while in solitary he lacked access to water, a sink, or personal hygiene products [122-3 Tr. 14-16]. This came after not being allowed to shower for nine days during the shakedown [*id.* Tr. 16-17]. During the period after the shakedown, he was left in the same underwear and t-shirt for ten days in a cold cell with feces on the wall infested with mice and cockroaches without cleaning supplies [122-4 ¶ 24-25, 30]. He reported complaining about the conditions to Lieutenant Lott and Sergeants Stovall and Hilliker as the inmates were being moved to new cells [122-4 ¶ 29; 112-8 Tr. 29-30].

The plaintiffs claim that Lieutenant Lott not only knew about but ordered the denial of showers [122-3 Tr. 11]. Lieutenant Lott denies there was a nine-day period when inmates couldn't shower [122-10 Tr. 23]. Sergeant Hilliker testified that she didn't know inmates were complaining either about showers or filing grievances [122-9 Tr. 28, 33]. Sergeant Stovall testified that he didn't remember any complaints from Mr. Buggs [122-16 Tr. 22]. There is a factual dispute about whether the prison guard defendants knew about Mr. Rutledge's, Mr. Buggs', and Mr. Phelps' conditions and chose to do nothing, and that means a jury must decide. Taking all reasonable inferences in the light most favorable to these three plaintiffs, a reasonable jury could find that Mr. Rutledge, Mr. Buggs, and Mr. Phelps experienced unconstitutional conditions of confinement and that Lieutenant Lott and Sergeants Stovall and Hilliker were deliberately indifferent. *See, e.g., Townsend*, 522 F.3d at 774 (lack of sanitary conditions including bedding

supports Eighth Amendment claim); *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (reversing summary judgment when prisoner lived for an unspecified time in cell with "filth, leaking and inadequate plumbing, roaches, rodents, the constant smell of human waste, poor lighting, inadequate heating, unfit water to drink, dirty and unclean bedding, without toilet paper, rusted out toilets, broken windows, [and] . . . drinking water containing small black worms which would eventually turn into small black flies"); *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989) (reversing summary judgment when prisoner spent three days in a cell with feces smeared on the wall without cleaning supplies and without running water).

Mr. Manjarez is different because he doesn't point to any evidence in the record that he notified the defendants about his conditions or circumstantially that the officers knew and deliberately disregarded his conditions—only that others complained about their conditions. His conditions are similar, but he doesn't provide any reason to think the guards would have been aware of them. Unlike the others, he never complained to the defendants on this record, only to people he had never seen before during the shakedown [112-11 Tr. 18-19 ("I couldn't tell who was who.").[3] Mr. Manjarez was moved to a cell on the 400 block on April 27, 2021 [112-11 Tr. 8]. During the shakedown, officers took his hernia belt [*id.* Tr. 21-22], and he didn't receive a new hernia belt for 10-12 days [122-14 ¶ 26].[4] His new cell had water dripping down the walls for three days, pooling to the point that he needed to tie plastic bags around his feet to protect them from the water, which he said smelled like sewage [112-11 Tr. 13-14, 37; 122-14 ¶ 22]. Like Mr.

---

[3] At another point, Mr. Manjarez asked an unnamed individual for cleaning supplies, but he testified that person wasn't named in this case [112-11 Tr. 38].

[4] Lieutenant Lott actually returned Mr. Manjarez's hernia belt when he found it at the main officer's station [112-1 Tr. 23-24].

Buggs, he had nothing but the t-shirt, underwear, and shower shoes he had on when they moved him, and he was left in those clothes for ten days in a cold cell [122-14 ¶ 14, 28; 122-13 Tr. 27]. No one provided him with cleaning supplies, eating utensils, or toilet paper [122-14 ¶ 15, 24]. He claims he was denied a shower from April 25, 2021 to May 5, 2021 [*id.* ¶ 27].

Mr. Manjarez's conditions are concerning, but there isn't a basis, on this record, for a reasonable jury to conclude that the officers would have been aware of his cell-specific problems, like sewage water. *Daugherty*, 906 F.3d at 611. His only potential path to liability is through the "inference from circumstantial evidence" that the risk was "so obvious that a jury may reasonably infer actual knowledge." *Vinning-El*, 482 F.3d at 924-25. Mr. Manjarez points out that Sergeant Hilliker typically "walk[ed] the ranges to see if anybody need[ed] anything" in D Cellhouse [122-9 Tr. 17], Lieutenant Lott "was in charge of running the cellhouse [122-10 Tr. 9], and Sergeant Stovall supervised officers and offenders [122-16 Tr. 4]. But he doesn't point to any evidence that they observed his cell conditions or that he ever alerted the officers of them, many of which, like the flooding, seem specific to him and are not necessarily conditions that would have impacted the entire unit. *Cf. Vinning-El*, 482 F.3d at 924. Simply making rounds throughout the prison isn't enough. *See Daugherty*, 906 F.3d at 611. His complaints to other people in the prison, if during the shakedown, came at a time when Sergeants Hilliker and Stovall and Lieutenant Lott weren't present. He hasn't provided enough evidence on this record for a reasonable jury to conclude that the defendants were aware of the risks in his cell or infer that knowledge without any evidence of a complaint from him. *See id.* (upholding summary judgment conditions of confinement claim where there was "no evidence that either [defendant] was specifically aware of the particular conditions forming the basis" of the plaintiff's Eighth Amendment claim).

Working on the range isn't enough to establish deliberate indifference on this record. The court grants summary judgment for the defendants on Mr. Manjarez's claims.

As to Mr. Rutledge's claim about solitary confinement, he says the only defendant involved was Lieutenant Lott, so the court will narrow his claims against Sergeants Hilliker and Stovall to exclude the period he was in solitary confinement [122-3 Tr. 25]. *Burks*, 555 F.3d at 593; *see also Boyd*, 2000 U.S. App. LEXIS 18777 at 7. Similarly, Mr. Rutledge briefly mentions seeing Sergeant Allmon, but he doesn't mention complaining to him about the conditions of his solitary cell [112-8 Tr. 28-29]. Nothing on this record shows that he was personally involved in the solitary cell conditions, so the court will exclude Sergeant Allmon from Mr. Rutledge's claim for this later period in SMC. Mr. Rutledge's claim for his time in SMC remains only against Lieutenant Lott because he was the only one with personal knowledge and involvement.

The prison officers also argue qualified immunity. The defense of qualified immunity "shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Marshall v. Allen*, 984 F.2d 787, 791 (7th Cir. 1993) (quotations omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If no constitutional right was violated, there is no need for further inquiry. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Some conditions are so "deplorably unsanitary" that qualified immunity won't shield officers; certain "egregious facts" would cause any reasonable officer to conclude that conditions offend the Constitution. *Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020) (leaving inmate in a cell "teeming with human waste" for 6 days violated the Constitution). Courts have long held that denying

prisoners the "minimal civilized measure of life's necessities" is a clearly established constitutional violation. *Vinning-El*, 482 F.3d at 924 (collecting cases). A reasonable jury could find that the prison officers knew about the conditions in the cells and ignored them, violating the plaintiffs' clearly established right to humane cell conditions. Qualified immunity doesn't shield the defendants.

### C.    *Excessive Force against Firefighter Defendants.*

Mr. Phelps and Mr. Rutledge also allege that firefighters Jimmie Vincent, Wyatt Dunkley, and William Cameron Stuart used excessive force against them by spraying them with the fire hose.[5] The "core requirement" for an Eighth Amendment excessive force claim is that the defendant "used force not in a good-faith effort to maintain or restore discipline, but maliciously and sadistically to cause harm." *Hendrickson v. Cooper*, 589 F.3d 887, 890 (7th Cir. 2009) (quotations and citation omitted). Several factors guide the inquiry for whether an officer's use of force was legitimate or malicious, including the need for an application of force, the amount of force used, and the extent of the injury suffered by the prisoner. *Id.* "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the constitution. *Graham*, 490 U.S. at 396 (quotations omitted). To survive summary judgment, Mr. Phelps and Mr. Rutledge must "present evidence supporting a reliable inference of wantonness in the infliction of pain." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 619 (7th Cir. 2022).

The firefighter defendants argue for summary judgment on four grounds. First, they claim that water only incidentally sprayed Mr. Phelps and Mr. Rutledge while they tried to put out fires

---

[5] Mr. Buggs and Mr. Manjarez have abandoned their excessive force claims. The court thus grants summary judgment for the firefighter defendants on Mr. Buggs' and Mr. Manjarez's excessive force claims.

on the range. Second, they argue that they acted on orders from a supervisor and that firehose use was added to the use of force continuum after inmates tried to assault officers, so legitimate penological interests in not being assaulted with bodily fluid justified the spraying. Third, they add that Mr. Phelps and Mr. Rutledge suffered only *de minimus* injuries. Fourth, they assert qualified immunity.

Firefighters Vincent, Dunkley, and Stuart responded to a call about fires and inmates assaulting officers with bodily fluids on April 30, 2021 [106-12 ¶ 10; 106-10 ¶ 10; 106-8 ¶ 11]. They saw a large fire and used the hose to put it out [106-11 Tr. 28, 31-32]. The fire was near cells 119 and 120 [106-17 Tr. 22]. The firefighters say they were acting under the command of the then-Director of Fire Risk Management, Charles Dudley, and the fire chief, Gordon Becher, to provide fire protection services during the shakedown [106-8 ¶ 4]. Their only task was to respond to fires; they didn't control inmate movement, perform cell extractions, remove property, or interfere with medical treatment [*id.* ¶ 24-27, 31; 106-10 ¶ 25-27; 31-32]; although on April 29, 2021, the shakedown rules of engagement were updated to allow the "in-cell utilization of a firehose for non-compliant incarcerated individuals" [106-8 ¶ 10].

Not all the firefighters were equally involved. Though Firefighter Vincent responded and remembered water being sprayed into cells, he was about 50 feet behind the nozzle, operating the emergency valve, didn't spray any water into the cells, and doesn't know who did [*id.* ¶ 13, 17, 19]. He wasn't close enough to see flames in the cell or the inmates in the cells after the fire [106-9 Tr. 21, 29]. He didn't remember spraying the hose on April 30, 2021 [*id.* Tr. 34]. Firefighter Vincent was too far away to be personally involved in the conduct, and neither Mr. Phelps nor

Mr. Rutledge points to any evidence for a reasonable jury to find that he was. *Doyle*, 305 F.3d at 614. The court grants summary judgment for Firefighter Vincent.

Firefighter Dunkley used the fire hose to "gain compliance from the incarcerated individuals who were refusing to be restrained and/or removed from their cells," acting on orders from a SERT team member [106-10 ¶ 20]. He held the hose and testified that only Firefighter Stuart sprayed it [106-11 Tr. 32]. Firefighter Dunkley testified that he cannot say for sure that the water hit any inmates, but he remembers "spraying all over there" and said that there was "no way they weren't going to get hit with it" [*id.* Tr. 40-41]. Firefighter Stuart added that firefighters used the hose to extinguish a fire and as a shield from bodily fluids [106-12 ¶ 12-13]. He denied using a firehose against any inmate [106-17 Tr. 18] and claims that if anyone was hit, "it was incidental to extinguishing the fire, rather than being intentional in nature" [106-12 ¶16].

Mr. Phelps and Mr. Rutledge tell a different story. According to Mr. Rutledge, the firefighters arrived after the fires were extinguished [122-4 ¶ 13]. Mr. Phelps testified that three firefighters "just start[ed] hosing us down" without any warning [122-1 Tr. 21-22]. He wasn't throwing bodily fluids and didn't light any fires, but he received the brunt of the firehose's spray [*id.* Tr. 26]. He testified that he told them to stop because he couldn't breathe, that he feared for his life, and that when he tried to stand so that they couldn't spray his face anymore, they shot his legs out from under him [*id.* Tr. 22]. Mr. Phelps testified that the hose wasn't needed because the fire was "completely out," not even smoking anymore [*id.* Tr. 23]. He compared the behavior to "literally shooting fish in a barrel" [*id.* Tr. 25] and thought it lasted between four and five minutes [122-2 ¶ 20].

Mr. Rutledge testified that he heard Mr. Phelps screaming and yelled for help, and then the firefighters turned the hose on him [122-3 Tr. 21]. The blast lifted him off of his feet and threw him against the back of his cell, knocking him out briefly [*id.* Tr. 21-22]. He believes the firefighters sprayed him for between three and five minutes [122-4 ¶ 20]. Both Mr. Phelps and Mr. Rutledge say they experienced pain from the incident [*id.* ¶ 21; 122-2 ¶ 36].

The submitted video doesn't directly contradict or confirm either version. The viewer cannot see a fire or into the cells, but firefighters shoot water into cells 118, 119, and 120 from a few feet away for just under two minutes, from 8:06 a.m. to 8:08 a.m. [122-5 DCH West L-5 070600 8:06:54-8:08:40]. It doesn't clearly contradict Mr. Phelps' and Mr. Rutledge's accounts, only the timing, and surely if a person is being sprayed at a close distance by a firehouse, a distorted view of time is not unexpected. *See Horton*, 883 F.3d at 944 (citing *Scott*, 550 U.S. at 378-81).

Testimony and affidavits from Mr. Phelps and Mr. Rutledge contradict the firefighters' first argument that Mr. Phelps and Mr. Rutledge were only incidentally hit. Both testified that the firefighters intentionally hosed them directly after the fire had been extinguished. Firefighter Dunkley also admitted to using the hose as a way of ensuring compliance against some incarcerated individuals [106-10 ¶ 20]. A jury must decide whether this was a direct assault or an incidental splashing.

The question of whether the firefighters used the hose for legitimate penological reasons also belongs to a jury. There is a factual dispute over whether the fire was still burning when Firefighters Stuart and Dunkley began spraying Mr. Rutledge and Mr. Phelps. The firefighters argue that Mr. Phelps and Mr. Rutledge don't have the qualifications or foundation to conclude

the fire was extinguished [134 at 8], but it doesn't take expertise to know that a visible fire is out, even if there might be more expert conclusions whether it could reignite or whether there is need for ongoing emergency services. And, if the fire was close enough to the cell that Mr. Rutledge and Mr. Phelps were sprayed when the officers were fighting, it seems likely they would be able to tell whether the fire was initially extinguished. A jury must decide these reasonable alternatives on this record, including whether the fire was still burning and whether the use of the hose was for the legitimate purpose of putting out the fire.

Similarly, the firefighters' argument that this was legitimate because prisoners were throwing bodily fluids on the officers doesn't warrant summary judgment. Mr. Phelps and Mr. Rutledge say they weren't among the prisoners starting fires, and Mr. Phelps denied throwing bodily fluids [122-1 Tr. 26; 122-4 ¶ 7; 122-2 ¶ 6], so this reason doesn't explain targeting their cells with a firehose to subdue or deter such behavior. A reasonable jury could disagree.

Additionally, the argument that they were acting under someone else's orders putting out fires doesn't provide legal cover for the choice to spray into these cells, especially when they haven't pointed to evidence that spraying cells 118, 119, and 120 was a direct order, much less in the manner that a reasonable jury could say it was done.

The firefighters also argue that Mr. Phelps and Mr. Rutledge haven't shown significant injury. Absence of serious injury bears on the excessive force inquiry "but does not end it." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Even a determination that injuries are *de minimis* isn't sufficient to dismiss a case. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (referring to the view that pain is actionable only when accompanied by significant injury as "seriously misguided"). "It is pain, not injury" that provides the "touchstone" of an excessive force claim. *Hendrickson*, 589

F.3d at 891 (quotations omitted). The firefighters cite *Hendrickson* for the idea that "in cases where it's debatable whether the use of force was legitimate or malicious, the lack of serious injury may tip the scales against the prisoner." *Id.* But that case was reviewing whether there was sufficient evidence to support a jury's previous finding that force was malicious. *Id.* at 891-92. The court doesn't assess tiebreakers on factual issues at summary judgment; that is a jury's role.

Finally, the firefighters argue that they are entitled to qualified immunity because they say that there isn't a closely analogous case holding that using a firehose in this way is clearly unconstitutional. "A constitutional right is clearly established for qualified-immunity purposes where [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 725 (7th Cir. 2013) (quotations omitted). "[A] case holding that the exact action in question is unlawful is not necessary." *Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016). The plaintiff bears the burden of proving that the right is clearly established by either pointing to a similar case or "showing that the force was so plainly excessive that, as an objective matter," officers would have been on notice they were using excessive force. *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015) (quotations omitted).

The plaintiffs point to *Jones-Bey v. Wright,* 1996 U.S. Dist. LEXIS 3666, 19-20 (N.D. Ind. Mar. 4, 1996). That case found that courts had held "that prisoners had been subjected to cruel and unusual punishment when guards intentionally sprayed them with a high-powered fire hose." *Id.* at 19 (citing *Campbell v. Grammer*, 889 F.2d 797, 802 (8th Cir. 1989)). In *Campbell*, the court upheld damages against the defendants even when the plaintiffs only had lingering back pain, blurred vision, and pain for about a day, injuries the court found "not especially severe." *Campbell*,

889 F.2d at 802. The firefighters cite *Gibbons v. Higgins*, 1995 U.S. App. LEXIS 36644, 22 (7th Cir. Dec. 20, 1995), which found that no court had "held that the use of a water hose is a *per se* violation of the Eighth Amendment." But that case involved short water bursts and no alleged injury, distinguishing it from this case. *Id.* at 22-24. Simply saying that using a firehose isn't a *per se* violation of the Constitution doesn't protect using a firehose against a prisoner from being clearly unconstitutional in different circumstances. This also isn't a case when the undisputed record demonstrates that spraying inmates with a hose was necessary to maintain control in the prison. *Cf. Poindexter v. Woodson*, 510 F.2d 464, 466 (10th Cir. 1975). There are questions on this record about the reason the hose was used, whether it was sprayed directly at Mr. Phelps and Mr. Rutledge, and whether it was necessary to maintain order in the moment. With critical facts in dispute, qualified immunity doesn't shield the firefighters, and the case must proceed to trial.

CONCLUSION

Accordingly, the court GRANTS summary judgment for Jimmie Vincent on the excessive force claim as to all plaintiffs, GRANTS summary judgment for the firefighter defendants for the claims by Mr. Buggs and Mr. Manjarez, GRANTS summary judgment for the prison guard defendants as to Mr. Manjarez's claims [112], DENIES the summary judgment motions as to all other defendants [105, 106, 109], and DENIES AS MOOT the incorrect motion for summary judgment [102]. The court ORDERS the parties to meet and confer on bifurcation of the excessive force and conditions of confinement claims for trial within 14 days of this order. Following the meeting, the defendants are ordered to file any motion for bifurcation by March 4, 2025, with any response by March 25, 2025.

SO ORDERED.

January 29, 2025                              *s/ Damon R. Leichty*
                                             Judge, United States District Court