UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

TERRY RUTLEDGE *et al.*,

    Plaintiffs,

v.

INDIANA DEPARTMENT OF
CORRECTIONS *et al.*,

    Defendants.

CAUSE NO. 3:22cv989 DRL-SJF

OPINION AND ORDER

Terry Rutledge,[1] Marshaun Bugg, and Cody Phelps sued multiple individuals employed by the Indiana State Prison (ISP) claiming their Eighth Amendment rights were violated. After summary judgment, the defendants filed a motion to sever the remaining claims into four separate trials. The three inmates oppose severance of any claims. The court grants the motion in part, severing the excessive force claims from the conditions-of-confinement claims only.

BACKGROUND

The previous summary judgment ruling shares greater detail about this case. *See Rutledge v. Ind. Dep't of Corr.*, 2025 U.S. Dist. LEXIS 16681, 2-6 (N.D. Ind. Jan. 29, 2025). The court assumes familiarity with this background and recounts only those facts necessary to decide this motion.

In the spring 2021, Messrs. Rutledge, Bugg, and Phelps were incarcerated at ISP and housed within D cellhouse, in individual cells. During this time, Lieutenant Dujuan Lott, Sergeant Erica Hilliker, Sergeant Brandon Stovall, and Sergeant Antonio Allmon, all remaining defendants,

---

[1] Terry Rutledge now identifies as a woman and prefers to be referred to as "miss/ma'am" [122-3 Tr. 4-5]. The court acknowledges this new preference, but this order continues to use "Mr." and "he/his/him" pronouns to remain consistent with the record, as it has been presented.

were employed as correctional officers. Wyatt Dunkley and William Stuart, likewise defendants but for a different claim, were employed as firefighters.

Following the death of an inmate and a correctional officer, ISP initiated a shakedown in D cellhouse that lasted from April 27 to April 30, 2021. During the shakedown, "emergency teams," comprised of correctional officers from different correctional facilities, conducted a comprehensive search for weapons and contraband in D cellhouse. This required moving all inmates in D cellhouse to other unoccupied cells. Mr. Bugg was moved to a different cell on April 27, 2021. Mr. Rutledge and Mr. Phelps were moved on April 30, 2021. ISP's regular prison staff, including the correctional officers named as defendants, weren't allowed to participate in the shakedown and didn't return to D cellhouse until after the shakedown ended on April 30.

Mr. Bugg, Mr. Rutledge, and Mr. Phelps allege that the conditions of their new cells were inhumane. They claim that they were denied cleaning supplies and clean clothes, that their cells had blood and fecal matter on the walls, and that the cells were freezing cold and rodent infested with no running water. Mr. Bugg and Mr. Phelps allege that they experienced these conditions until approximately May 5, 2021 (thus, eight days for Mr. Bugg and five days for Mr. Phelps), whereas Mr. Rutledge says his conditions lasted until May 8, 2021 (thus eight days).

All three inmates allege that they complained about these conditions to the four correctional officers they have sued, but these officers were deliberately indifferent to their concerns. The correctional officers deny knowing about these conditions or complaints. Mr. Rutledge adds a separate allegation that relates to the conditions of his confinement in a special management cell where he was moved on May 11. He says the conditions there were just as bad, and he sues Lieutenant Lott as only he was responsible for this second move.

Separate from these conditions-of-confinement claims, Mr. Rutledge and Mr. Phelps (not Mr. Bugg) pursue excessive force claims against the two named firefighters based on events that occurred during the shakedown and before they were moved to new cells. They say, early in the morning of April 30, the firefighters were called to extinguish a fire that was started by other inmates by their cells and, in the course of fighting the fire, intentionally sprayed Mr. Phelps and Mr. Rutledge with enough force to cause injury.

After the summary judgment ruling, the court ordered the parties to confer and, if necessary, file any motions seeking to conduct separate trials of these claims. *See Gaffney v. Riverboat Servs. of Ind., Inc.*, 451 F.3d 424, 442 (7th Cir. 2006) (severance should be used when "one claim [is] capable of resolution despite the outcome of the other claim," whereas bifurcation applies when "claims are factually interlinked, such that a separate trial may be appropriate, but final resolution of one claim affects the resolution of the other"). The court now addresses the fully-briefed motion by the defense to proceed with four trials.

## STANDARD

Under Rule 21, the court may sever "any claim against a party" and establish independent proceedings so long as the claim is "discrete and separate" from others. *Gaffney*, 451 F.3d at 442. A claim is "discrete and separate" from others when it is capable of resolution "despite the outcome of the other claim." *Id.* In deciding whether to sever claims, the court considers the convenience and fairness to the parties, the claim's separability in logic and law, and whether severance "serve[s] the ends of justice and facilitate[s] the prompt and efficient disposition of the litigation." *Malibu Media, LLC v. Doe*, 287 F.R.D. 513, 522 (N.D. Ind. 2012) (quotation omitted); *see also United States v. SCA Servs.*, 150 F.R.D. 141, 146 (N.D. Ind. 1993). It is within the court's

3

"broad discretion" to sever claims, *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1016 (7th Cir. 2000), so long as severance doesn't "separate an essentially unitary problem," *Hebel v. Ebersole*, 543 F.2d 14, 17 (7th Cir. 1976) (quotation omitted).

Both parties work within a shared five-factor framework to advance their positions: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *In re High Fructose Corn Syrup Antitrust Litig.*, 293 F. Supp.2d 854, 862 (C.D. Ill. 2003). The court views the overarching standard as broader, thus these considerations as nonexclusive, but they can prove helpful in working through a severance motion.[2]

## DISCUSSION

The parties are diametrically opposed on severance. The defense asks the court to sever the excessive force claims against the firefighters from the conditions-of-confinement claims against the correctional officers, and then to sever each conditions-of-confinement claim from any other, resulting in four separate trials. The three inmates oppose any type of severance and seek a single trial. The court sees the wisdom of a different approach altogether—severing the excessive force claims from the conditions-of-confinement claims into two trials.

These claims concern a different occurrence and a different harm, but only insofar as the conditions-of-confinement claims are not one-by-one severed. Mr. Phelps's and Mr. Rutledge's

---

[2] This framework has often been used by other district courts in this circuit. *See e.g.*, *MHG Hotels, LLC v. Studio 78, LLC*, 2019 U.S. Dist. LEXIS 8106, 2-3 (S.D. Ind. Jan. 16, 2019); *Jones v. Eli Lilly & Co.*, 2015 U.S. Dist. LEXIS 141925, 16 (S.D. Ind. Oct. 19, 2015); *Cantu v. Ken Nelson Auto Mall, Inc.*, 2010 U.S. Dist. LEXIS 104035, 9 (N.D. Ill. Sept. 29, 2010); *Dada v. Wayne Twp. Trustee's Office*, 2008 U.S. Dist. LEXIS 43179, 5-6 (N.D. Ind. May 30, 2008).

excessive force claims stem from a single incident that occurred on April 30, 2021, only during the shakedown, before they moved to new cells, involving only the firefighters, and their alleged act of excessive force. In contrast, the conditions-of-confinement claims involve all three inmates, occurring only when the shakedown ended, in different locations within ISP, naming only the correctional officers, for a completely different type of harm than excessive force. Just at the start, these two classes of claims are separable by law and logic. *See SCA Servs.*, 150 F.R.D. at 146; *see, e.g., George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) ("multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2").

The inmates assert that their excessive force claims are "so closely related" to the conditions-of-confinement claims so as to arise from the same occurrence because the shakedown preceded both events and the firehose incident occurred immediately before Mr. Phelps and Mr. Rutledge moved to new cells. The fact that one major event preceded otherwise distinct occurrences adds little to any shared calculus than mere timing. It also ignores Mr. Bugg who only has a conditions-of-confinement claim after being transferred to a different cell on April 27, 2021, not any excessive force claim against the firefighters.

The inmates believe that evidence and witnesses will potentially overlap. Specifically, they say Mr. Rutledge and Mr. Phelps will rely on evidence related to the firehose incident to prove their conditions-of-confinement claims because it was the firehose incident that helped to precipitate the transfer. Not really, at least not materially outside of a rather general storyline, because one event truly has nothing to do with proving the other. To prove a conditions-of-confinement claim, the three inmates each would need to convince the jury that their respective

5

conditions were sufficiently serious by denying them the minimal civilized measure of life's necessities and creating an excessive risk to their health and safety, as well as a culpable state of mind for each defendant. *See Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017); *see also Wilson v. Seiter*, 501 U.S. 294, 297-99 (1991). That, before they faced these conditions, two firefighters allegedly used excessive force on only two of these inmates neither materially proves nor materially disproves what conditions they faced later or what separate defendants did or intended.

That said, the inmates are right that the defense slices up the claims too finely by endeavoring to divide each conditions-of-confinement claim into a separate trial. That these inmates may have been moved on sightly different days (albeit within the same window) or to different cells doesn't alone require that the court treat these as logically severable claims. This proposal invites inefficiency, indeed duplication, in the presentation of evidence and testimony, and it disregards material allegations linking each of these claims: that the same correctional officers, from May 1, 2021 (when each returned to D cellhouse) to May 5, 2021, deliberately ignored the same or similar poor conditions experienced by these inmates.[3] *See Benitez v. Am. Std. Circuits, Inc.*, 678 F. Supp.2d 745, 769 (N.D. Ill. 2010) ("Where plaintiffs' claims derive from the same type of alleged action by the same employee in the same facility, courts have found severance inappropriate.").

The excessive force and conditions-of-confinement claims also involve different questions of law. *Compare Isby*, 856 F.3d at 521 (reciting elements for conditions claim) *with Hendrickson v. Cooper*, 589 F.3d 887, 890 (7th Cir. 2009) (stating the "core requirement" for Eighth

---

[3] Mr. Rutledge's claim alleges exposure to conditions until May 8, 2021 and then, as to only one of the correctional officers (Lieutenant Lott) again from May 11-20, 2021. Not even the defense seeks to sever this out, and the court believes this add-on to his constitutional claim can still be tried with the rest.

Amendment excessive force claims is that the force used was not "in a good-faith effort to maintain or restore discipline, but maliciously and sadistically to cause harm.") (quotations omitted). Although juries frequently address different law for different claims, they often do so when these legal questions arise from the same core or closely related set of facts. These claims of excessive force don't, even as the individual conditions-of-confinement claims materially do (*e.g.*, being denied cleaning supplies and clean clothes, fecal matter and blood on the cell walls, freezing temperatures, rodent infestations, and lack of running water).

The inmates are quite right to raise valid concerns over the increase in cost, time, and logistical burden that would result from severing their claims into four separate trials. The defense adds little on this point. The court recognizes the modest increase in cost and time for two trials too, but the efficiencies gained easily outweigh any efficiencies lost. Indeed, two trials promote efficiency best and also maximize fairness for each side. Two firefighters need not sit through an entire portion of a trial devoted to something that doesn't concern them, and likewise four correctional officers need not sit through another portion of the trial devoted to something that reportedly occurred when they weren't there. On the flip side, there is nothing troubling about having the four correctional officers participate in the same trial when they all allegedly participated in some measure of a constitutional deprivation, even if as against three different inmates within the cellhouse.

The parties debate prejudice. The defense seems concerned about one inmate testifying about another inmate's experience, but the evidentiary rules—for instance, the requirement of personal knowledge under Rule 602, or the exclusion of speculation or overweening prejudicial statements under Rule 403—address this already. And, to the extent one inmate has personal

knowledge and something relevant to add about another inmate's claim, this would remain an issue of debate whether the court severed the trials or not.

The defense worries about the jury impermissibly considering what the defense calls habit evidence if the jury hears multiple plaintiffs testify that the correctional officers were indifferent to their complaints over multiple days. These same concerns can likewise be addressed through the careful management of testimony during trial, as well as either objections then or prior motions *in limine*. Specific jury instructions will tell jurors that they must consider each claim and each defendant separately, and that they must not hold a defendant liable for what he or she did not do (or what someone else did or did not do)—the same principle of personal responsibility that runs through constitutional jurisprudence under 42 U.S.C. § 1983. *See Rodriguez v. Peters*, 63 F.3d 546, 559 (7th Cir. 1995) ("Jurors are presumed to follow . . . [all] instructions from the court.") (quotations omitted). Any remaining unease from the defense is trivial, particularly with this severance into two trials, such that no further severance makes sense. *See Benitez*, 678 F. Supp.2d at 770 ("[S]*ome* prejudice is allowed if the prejudice is not so substantial that it outweighs the savings of time and effort in having a single trial.") (quotations and citation omitted).

For their part, the inmates worry about the increased costs and inconvenience of changing trial strategy. What that would be the court cannot fathom. *See SCA Servs.*, 150 F.R.D. at 146 (court must consider convenience to the parties). No trial has been set. No one claims to have completed their trial preparations. No one likely has taken significant steps toward their preparations. And, to the extent they have, the severance of the excessive force claims from the unrelated conditions-of-confinement claims merely compartamentalizes those preparations into

8

two clear lanes, not loses it to the wayside altogether. It permits the parties to be laser-focused in their tasks, which in the court's experience is more, not less, conducive to a smartly-tried case.

The inmates last raise what they call a Seventh Amendment concern, arguing that severance of claims may result in inconsistent verdicts. In truth, this argument makes little sense. Whatever a jury might award an inmate against a firefighter will have no bearing on what that inmate might win against a correctional officer. And whether a firefighter wins in defense, or whether a correctional officer does for that matter, will have no bearing on the other. Not even a win or loss by one correctional officer will bear on another correctional officer's result when the jury must consider each claim and each defendant separately. Any apprehension about the jury's function strikes as something ably addressed by jury instructions and a special verdict form. The court's severance of the case between excessive force and conditions-of-confinement claims likewise ensures that any modest overlapping factual questions tend to remain that way. "The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact." *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995). Here, a jury presiding over the excessive force claims won't be asked to reexamine another jury's factual findings from the conditions-of-confinement claims, or vice versa.

## CONCLUSION

Accordingly, the court GRANTS IN PART and DENIES IN PART the defense's motion to sever [158]. The court severs Mr. Rutledge's and Mr. Phelps's excessive force claims from Mr. Bugg's, Mr. Rutledge's, and Mr. Phelps's conditions-of-confinement claims and ORDERS

9

separate trials for each set. A conference will be set by separate order to address trial scheduling and final pretrial dates.

    SO ORDERED.

January 22, 2026                        *s/ Damon R. Leichty*
                                          Judge, United States District Court